## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL S. LERNER, on behalf of himself and all other similarly situated shareholders of SINOVAC BIOTECH LTD., | Case No. |
| Plaintiff, | **VERIFIED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SINOVAC BIOTECH LTD. and WEIDONG YIN, | |
| Defendants | |

Plaintiff Michael S. Lerner ("Plaintiff"), on behalf of himself and all other similarly situated public shareholders of Sinovac Biotech Ltd. ("Sinovac" or the "Company"), by and through his undersigned counsel, brings this Verified Class Action Complaint (the "Complaint") against Sinovac and Sinovac's founder, President, Chief Executive Officer ("CEO") and Chairman Weidong Yin ("Yin") ("Yin," and together with Sinovac, the "Defendants"), and asserts that Defendants wrongfully diluted the equity interests held by Plaintiff and other public shareholders of Sinovac in violation of the law of Antigua and Barbuda. Except for the allegations specifically pertaining to Plaintiff, which are based upon Plaintiff's personal knowledge, the allegations in the Complaint are based upon the investigation conducted by Plaintiff's counsel, which included, among other things, a review of filings made with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, and other publicly available documents, as well as on information and belief.

## NATURE OF ACTION

1.      Since at least February 2016, Yin has sought to take Sinovac private, and to pay as little as possible in doing so. Yin's initial 2016 attempt to complete a going private transaction

failed as the result of a superior bid from another group.  After the failure of the 2016 transaction, Sinovac's board of directors (the "Board") caused the Company to enter into a rights agreement, adopting a "poison pill" provision that operated to dilute the voting power of certain minority shareholders who had opposed the 2016 transaction (the "Rights Agreement").  In 2017, Yin and his buyer consortium, which included Vivo Capital, LLC ("Vivo Capital"), Advantech Capital LP ("Advantech"), SAIF Partners IV L.P. ("SAIF Partners"), and C-Bridge Healthcare Fund II, L.P. ("C-Bridge Capital"), tried again to take the Company private, but again failed due to a higher competing bid.

2.      In the wake of the failed going private transactions, on July 2, 2018, Sinovac entered into an agreement with Vivo Capital and Advantech (two members of Yin's 2017 buyer consortium) to issue and sell to them 11.8 million shares of Sinovac common stock at a purchase price of $7.35 per share in cash through a private investment in public equity transaction (the "PIPE Transaction" or the "Transaction").  At the time of the PIPE Transaction, there had been a higher competing bid to acquire Sinovac at $8 per share, and Sinovac shares were trading publicly at $7.46 per share.  As a result of the unfairly low priced PIPE Transaction, the shareholder voting power and percentage ownership of Sinovac equity by Plaintiff and the other members of the Class (as defined herein) decreased, while Yin and his friendly investors amassed a dominant percentage of Sinovac's shareholder voting power.

3.      Significantly, after the PIPE Transaction, Sinovac engaged in several additional transactions in which Sinovac issued further dilutive equity at prices that valued the Company as much as 7x greater than the value implied in the PIPE Transaction.  Further, Sinovac has gone from success to success and is currently one of the world's largest manufacturers of vaccines and the world's single largest producer of COVID-19 vaccines.  As a result of the

PIPE Transaction however, Sinovac's public shareholders have been deprived of their rightful pro rata portion of Sinovac's success, while Yin and his cronies enjoy their outsized share.

## JURISDICTION AND VENUE

4.      This Court maintains original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Sinovac initiated and continues to be a party to current litigation pending in this District.  *See Sinovac Biotech Ltd v. 1Globe Capital LLC et al.*, No. 18-CV-10421-NMG (D. Mass., filed Mar. 5, 2018). *See also Heng Ren Investments LP v. Sinovac Biotech Ltd.*, 542 F. Supp. 3d 59, 65 (D. Mass. 2021) ("This Court concludes that Sinovac has submitted to the jurisdiction of this Court because it filed a case in this district which arises from the same nucleus of operative fact as the instant action.").

## PARTIES

6.      Plaintiff is a shareholder of Sinovac and has continuously held Sinovac stock since November 2012.  Plaintiff is a citizen of California.

7.      Defendant Sinovac is a biopharmaceutical company that researches, develops, manufactures, and commercializes vaccines.  Sinovac is incorporated in Antigua and Barbuda with its principal place of business in Beijing, China.  Prior to February 2019, Sinovac stock traded on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "SVA."  In February 2019, NASDAQ suspended trading of Sinovac's stock in connection with ongoing litigation between the Company and activist investors concerning control of Sinovac's Board (the "Trading Suspension"). Immediately before the Trading Suspension, Sinovac stock traded at $6.47.  The day before the PIPE Transaction was announced, Sinovac stock traded at $7.46.

8.      Defendant Yin is Sinovac's longtime Chairman, President, and CEO, positions he has held since September 2003.  At all relevant times, Yin has exercised control over the business affairs of Sinovac.  According to Yin's biography published on Sinovac's website, Yin was "instrumental" to the development of Healive, Sinovac's first vaccine, launched in 2002.  The Chinese Ministry of Science and Technology has appointed Yin as the principal investigator for "many key governmental [research and development] programs," including for the research and development ("R&D") programs associated with Sinovac's Healive and Avian Influenza vaccines.[1]

## RELEVANT NON-PARTIES

9.      Vivo Capital is a healthcare investment firm headquartered in Palo Alto, California, with offices in Beijing, Shanghai, Taipei, and Hong Kong.  Vivo Capital invests in the biopharmaceutical, medical devices, and new non-oncology industries, among others.  As a result of the PIPE, Vivo Capital received 8.29% of Sinovac's equity at a highly undervalued price.  Vivo Capital was a part of the buyer consortium in the failed 2017 going-private transaction.

10.     Advantech is a private equity fund with offices in Hong Kong and Beijing.  According to Advantech's website, the fund invests in two sectors: TMT and e-services, and healthcare.[2]  As part of the fund's "disciplined investment approach," Jianming Yu, founder and leader of the fund, and his unnamed team impose "stringent investment criteria and screening process[es]," in approaching their investments.  As a result of the PIPE, Advantech received 8.29% of Sinovac's equity at a highly undervalued price.  Advantech was a part of the buyer consortium in the failed 2017 going-private transaction.

---

[1]  Sinovac,  http://www.sinovac.com/investor/show.php?id=228&lang=en  (last  visited  Dec.  1, 2022).
[2]  Advantech Capital, http://www.advantechcapital.com/ShangChengEn-SencondAbout.html (last visited Dec. 1, 2022).

11.     SAIF Partners is a private equity firm with offices across Mainland China and in Hong Kong.  Through four funds, SAIF Partners invests in the TMT, "medical/healthcare," and "consumer products & services" sectors.[3]  SAIF Partners and Yin teamed up in both of the failed going private transactions.  At the time of the 2016 attempt, SAIF Partners owned 15% of Sinovac. As of April 29, 2022, when Sinovac filed its annual report, SAIF Partners was still Sinovac's largest shareholder, owning 18.89% of the Company.[4]

12.     Sinobioway Group Co., Ltd. ("Sinobioway") is one of three corporations affiliated with Peking University in Beijing.[5]  Sinobioway focuses its investments on biomedicine, bioagriculture, bioservices, bioenergy, bioenvironment, and biomanufacturing.[6]  In both 2016 and 2017, Sinobioway thwarted Yin's attempts to take the Company private by providing superior offers.

## SUBSTANTIVE ALLEGATIONS

### A.     Background Of Sinovac's Business

13.     Founded in 2001, over the last two decades Sinovac has grown into one of the world's largest pharmaceutical companies.  Sinovac's revenue is derived entirely from the sale of the vaccines that the Company develops.  These vaccines are sold in China and throughout the world.

14.     In 2002, Sinovac launched its first product, Healive.  Healive was the first inactive hepatitis A vaccine developed, produced, and marketed by a China-based manufacturer.  Since Healive's release, the Chinese government has awarded Sinovac regulatory approval to produce vaccines for various diseases, including, in 2005, for a hepatitis vaccine (Bilive) and an influenza

---

[3] SAIF Partners, https://www.sbaif.com/portfolio.html (last visited Dec. 1, 2022).
[4] Sinovac Biotech Ltd., Annual Report (Form 20-F) (Apr. 29, 2022).
[5] Sinobioway, https://www.sinobioway.com/about/ENchairman.html (last visited Dec. 1, 2022).
[6] Sinobioway, https://www.sinobioway.com/index/ENindex.html (last visited Dec. 1, 2022).

vaccine (Anflu).  In April 2008, Sinovac received approval for production in China of an Avian Influenza Vaccine.  Sinovac's Avian Influenza Vaccine has been approved for sale to the Chinese national vaccine stockpiling program.  In 2009, Sinovac was granted a license for Panflu 1, the first approved vaccine in the world against the influenza A H1N1 virus (swine flu).  In December 2011, Sinovac obtained a license from Chinese regulators for its mumps vaccine and launched the vaccine in late 2012.  In December 2015, Chinese regulators approved a license for Inlive enterovirus 71, a vaccine for foot and mouth disease, which Sinovac launched in China in June 2016.  Between June 2017 and February 2019, Sinovac's pipeline of new vaccines continued to grow, as the Company filed new drug applications for a pneumococcal polusaccharide vaccine ("PPV"), varicella vaccine, and quadrivalent influenza vaccine.

15.     During this period of growth, Sinovac began and ramped up what at the time was its most ambitious project—developing a new polio vaccine that would be low cost and safer than other low cost polio vaccines.  As described in detail in the next section, beginning in 2014, Sinovac began development of a Sabin Inactivated Polio Vaccine ("sIPV")—a potentially enormous source of future revenue for the Company.

16.     Sinovac's robust pipeline of and success in developing and commercializing vaccines has resulted in explosive revenue growth.  Between 2016 and 2017, Sinovac's revenue more than doubled.[7]  By 2018, Sinovac reported annual revenue of $230 million and gross profits of $204 million.[8]  The commercial success of a single vaccine presents opportunity for significant, multi-year growth for the Company because Sinovac's revenue is derived entirely from the sale of

---

[7] *See* Sinovac Biotech Ltd., Report of Foreign Issuer Form 6-K) (Nov. 22, 2017); *see also* Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (May 11, 2018).
[8] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Apr. 30, 2019).

vaccines.  When Sinovac's revenue more than doubled between 2016 and 2017, a single vaccine—
Inlive enterovirus 71—accounted for 70% of Sinovac's total sales.[9]

17.     The benefits of the success of a single vaccine were fully realized in 2021 as a result
of the Covid-19 pandemic.  By 2021, with the success of its polio vaccine and its development and
sale of the world's most utilized Covid-19 vaccine, Sinovac reported $19.4 billion in revenue, and
$18.3 billion in gross profit—a more than 40 fold increase in profits in just one year.[10]

**B.     Prior To The Failed Take Privates and Successful PIPE Transaction,
Yin And Sinovac Were Aware That Development Of A New Polio Vaccine
Could Materially Increase The Value Of The Company**

**1.     The Importance Of A New Polio Vaccine**

18.     There are two types of polio vaccines: "attenuated" and "inactive."  Attenuated
vaccines contain a live weakened virus and are commonly used in lesser developed nations.  The
attenuated polio vaccine is known as the "Sabin" vaccine.  Inactive vaccines contain a dead virus
and are widely used in developed nations.  The inactive polio vaccine is known as the "Salk"
vaccine.

19.     In China and in developing countries around the world, the oral polio vaccine (OPV)
was widely utilized.[11]  The OPV is an attenuated vaccine that is generally effective in immunizing
infants against polio.  In rare cases, however, infants who receive the OPV contract polio.[12]  In
order to eliminate that risk, in 1988, the World Health Organization ("WHO") launched the Global
Polio Eradication Initiative (the "Initiative").[13]  As part of the Initiative's Polio Eradication and

---

[9] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (May 11, 2018).
[10] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (May 2, 2022).
[11] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (June 24, 2014) at Ex. 99.1.
[12] Id.
[13] Polio Global Eradication Initiative, https://polioeradication.org/who-we-are/our-mission/ (last
visited Dec. 1, 2022).

Endgame Strategic Plan for 2013 – 2018, the WHO urged all countries to introduce at least one inactive polio vaccine ("IPV") into their routine immunization programs, phasing out OPVs.[14]

20.     Despite the safety benefits, developing and commercializing an "inactive" vaccine has been more expensive than developing an "attenuated" vaccine.  Thus, the market for cheaper "inactive" versions of a polio vaccine is enormous and the development of a less expensive "inactive" vaccine has assumed critical importance in the global fight against polio.

21.     Moreover, in addition to the opportunity to replace OPVs with IPVs, the overall global polio vaccine market is projected to grow from approximately $1.25 billion in 2018 to $2.15 billion in 2028.  Recognizing this lucrative opportunity for a new IPV, the Company moved aggressively to enter this market.

**2.     Sinovac Develops A New Polio Vaccine - The sIPV**

22.     On April 28, 2014, the Company entered into a license agreement with Intravacc, a government institute working under the Dutch Ministry of Public Health, Welfare and Sports, to develop and commercialize Sinovac's sIPV for distribution in China and other countries.[15]  In the Company's press release announcing the license agreement, Sinovac acknowledged:

> Sabin IPV is both safer to manufacture[] and more affordable as compared to the currently available Salk IPV.  The global demand for IPV is increasing as the [Initiative] has called for IPV to be introduced in 126 countries currently using OPV only by the end of 2015.  According to [the Initiative's Polio Eradication and Endgame Strategic Plan for 2013 – 2018], from 2014 – 2018, the use of OPV in routine immunization will be gradually ceased.[16]

---

[14]  World Health Organization, POLIO ERADICATION & ENDGAME STRATEGIC PLAN 2013-2018 (2013) at 61, https://polioeradication.org/wp-content/uploads/2016/07/PEESP_EN_A4.pdf.
[15]  Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (June 24, 2014) at Ex. 99.1.
[16]*Id.*

23.     On October 29, 2014, China's National Medical Products Administration ("NMPA") (f/k/a the China Food and Drug Administration) accepted Sinovac's clinical trial application for the Company's sIPV.[17]

24.     On December 10, 2015, Sinovac obtained approval to begin clinical trials on its sIPV.[18]  The first of three phases of the clinical trials was poised to begin in the first half of 2016.  All three phases were expected to be complete by 2018.  Ultimately, Phase I of the sIPV clinical trial commenced in October 2016.  After preliminary results showed a positive safety profile, Phase II initiated.[19]  Phase II was completed in 2017.[20]

### C.     Given The Anticipated Success Of The Polio Vaccine, Yin Immediately Begins A Campaign To Eliminate Or Significantly Dilute The Interests Of Public Shareholders

#### 1.     The 2016 Attempt

25.     Immediately after disclosing approval to begin clinical trials on Sinovac's sIPV, Yin, the Board he controls, and certain investors initiated a series of transactions in an effort to reap for themselves the benefits of the sIPV, as well as other vaccines that were under development.  Twice attempting to take Sinovac private, Yin and his supporters set out to remove Sinovac's public shareholders.

26.     On January 30, 2016, the Board received a letter from Yin and SAIF Partners (the "Yin Group") to acquire all of the outstanding shares of Sinovac common stock for $6.18 per share in cash.[21]  In response, the Board formed a special committee comprised of Simon Anderson, Yuk Lam Lo, and Meng Mi (the "Special Committee") to consider the proposal.  Together, the Yin

---

[17] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Nov. 17, 2014) at Ex. 99.5.
[18] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Jan. 5, 2016) at Ex. 99.1.
[19] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Feb. 8, 2017) at Ex. 99.1.
[20] Sinovac Biotech Ltd., Annual Report (Form 20-F) (Nov. 22, 2017).
[21] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Feb. 1, 2016) at Ex. 99.1.

Group owned approximately 29.5% of the Company's common stock; Yin owned 10.6% and SAIF Partners, Sinovac's largest shareholder, owned 18.9%.[22]

27.     The Yin Group's proposal grossly undervalued Sinovac's stock.  By February 3, 2016, a buyer consortium led by a minority shareholder of the Company, Sinobioway Group Co., Ltd. (the "Sinobioway Consortium"), sent a letter to the Special Committee proposing to acquire all of Sinovac's outstanding shares of common stock for $7.00 per share in cash.[23]  At the time, the Sinobioway Consortium collectively owned approximately 27% of Sinovac's principal operating subsidiary, Sinovac Beijing.[24]

28.     Ultimately, Yin rejected the superior offer from the Sinobioway Consortium, provided no counter-offer, and the deal was never consummated.

### 2.     Yin Causes Sinovac to Massively Dilute Shareholders Through an Oppressive Rights Plan Disguised as a Dividend

29.     Just over a month after Yin's failed 2016 Attempt, on March 28, 2016, Sinovac announced that the Board had adopted a shareholder rights plan, the Rights Agreement.  The Rights Agreement contained a "poison pill" provision providing that if a person or group acquired or announced an intent to acquire at least 15% of Sinovac stock, Yin and the Board could massively dilute all such shareholders.

30.     While the Rights Agreement is complex and purports to give public shareholders purchase rights "to assure that all of the Company's shareholders receive fair and equal treatment in the event of any proposed takeover of the Company[,]" the practical application of the terms of

---

[22] Sinovac Biotech Ltd., Annual Report (Form 20-F) (Apr. 25, 2016).
[23] The Sinobioway Consortium was comprised of PKU V-Ming (Shanghai) Investment Holdings Co., Ltd., Shandong Sinobioway Biomedicine Co., Ltd., CICC Qianhai Development (Shenzhen) Fund Management Co., Ltd., Beijing Sinovioway Group Co., Ltd., Heng Feng Investments (International) Limited, and Fuerde Global Investment Limited.  Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Feb. 4, 2014).
[24] Sinovac Biotech Ltd., Annual Report (Form 20-F) (Apr. 25, 2016).

the Rights Agreement is that it allows Yin and his Board to block any potential transaction of which they do not approve.

31.     The Rights Agreement initially set its expiration date for March 27, 2017.  The Company has consistently extended that date.  At the time of the PIPE Transaction, Sinovac had amended the Rights Agreement to extend through March 27, 2019.[25]

### 3.     The 2017 Attempt

32.     Armed with the Rights Agreement, Yin tried again to take Sinovac private.  On June 26, 2017, Sinovac announced that the Company had entered into a definitive amalgamation agreement with Sinovac (Cayman) Limited and its wholly owned subsidiary, Sinovac Amalgamation Sub Limited, to take Sinovac private (the "Amalgamation Agreement").[26]  The Amalgamation Agreement provided that Sinovac (Cayman) Limited would acquire Sinovac for cash consideration of $7.00 per share.  The 2017 Attempt would be funded through cash contributions from Advantech, Vivo Capital, and C-Bridge Capital.

33.     Pursuant to the Amalgamation Agreement, after acquiring Sinovac, Sinovac (Cayman) Limited would be owned by a buyer consortium comprised of Yin, SAIF Partners, Advantech, Vivo Capital, and C-Bridge Capital (the "Amalgamation Buyers").  Collectively, at the time of their offer, the Amalgamation Buyers owned 29.5% of Sinovac's outstanding common stock.

34.     At the time of the 2017 offer, the Amalgamation Buyers would have been subject to the provisions of the Rights Agreement designed to block takeover attempts.  That problem, however, didn't last long.  By June 30, 2017, Sinovac amended the Rights Agreement to exempt

---

[25] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Mar. 26, 2018).
[26] Sinovac Biotech Ltd., Report of  Foreign Issuer (Form 6-K) (June 26, 2017) at Ex. 99.1.

the Amalgamation Buyers from its provisions.  They also adopted a Second Amendment to the Rights Agreement to allow their new take private attempt to proceed.

35.    The June 2017 amendments to the Rights Agreement demonstrate that the 2017 Attempt, much like the 2016 Attempt, was a calculated, strategic move designed solely to cut out Sinovac's public shareholders.

36.    Once again, however, promptly after the Company announced the Amalgamation Agreement, and notwithstanding the blocking provisions in the Rights Agreement, on June 28, 2017, the Sinobioway Consortium submitted a superior proposal, offering $8.00 per share in cash to acquire Sinovac's outstanding common stock.  The offer was a 14.9% premium over the Yin Group's $6.47 offer in 2016.

37.    Additional Sinovac shareholders voiced support for the $8.00 offer proposed by the Sinobioway Consortium.  1Globe Capital LLC ("1Globe"), an activist investor, filed a Schedule 13-D shortly after Sinovac announced the Amalgamation Agreement.[27]  In the Schedule 13-D, 1Globe disclosed its ownership of 16.4% of Sinovac's common stock and expressed support for the Sinobioway Consortium's proposal and willingness to vote in favor of that transaction and to rollover its Sinovac shares into partial ownership of the post-transaction company.

38.    As with the 2016 Attempt, Yin rejected the superior offer from the Sinobioway Consortium and, ultimately, the Amalgamation Agreement was terminated on July 3, 2018.

**4.    The 2018 Shareholder Vote**

39.    On February 6, 2018, Sinovac held its annual meeting of shareholders.[28]  The Company's public shareholders exercised their voting rights and voted to install a new slate of directors (the "2018 Vote").  Despite that vote, the then-existing Board refused to relinquish

---

[27] Sinovac Biotech Ltd., Schedule 13D  (July 7, 2017).
[28] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Feb. 7, 2018) at Ex. 99.1.

management and control of the corporation.  Sinovac and the Board claimed that the purported election of the new slate of directors was invalid under Antigua law, asserting that Antigua law requires shareholders to provide advance notice of their intent to seek replacement of the incumbent board of directors.  The validity of the 2018 Vote is the subject of litigation before the courts of Antigua and Barbuda and a decision in favor of Yin and his Board is on appeal to the Privy Counsel of the United Kingdom.  In addition, Sinovac sued 1Globe in litigation now pending before this Court, seeking declaratory and injunctive relief.  Sinovac claimed that 1Globe, by "failing to disclose [their] intention to seek to change control of Sinovac" and to update their Schedule 13-D prior to the vote, violated Section 13(d) of the Securities Exchange Act of 1934 (the "1Globe Litigation").[29]

### D.    Yin Conceals the sIPV's Breakthrough In the Global Fight Against Polio

40.    Phase I and Phase II of clinical trials typically involve early phase development of a new drug and testing on animals.  Phase III, however, is outcome-determinative and is the most significant phase, involving human clinical trials to compare a drug being tested to various control drugs.[30]  A Phase III trial for Sinovac's sIPV was initiated in August 2017, and was completed six months later.[31]

41.    On April 19, 2018, Sinovac announced the preliminary results of Phase III (the "April Disclosure") as part of an "unblinding conference" (i.e, the process by which the treatment/allocation details of a vaccine are made available).  The Company disclosed only that:

> The preliminary results of the trial after unblinding show the seroconversion rate of poliovirus type II is superior to the control vaccine and

---

[29] See Sinovac Biotech Ltd v. 1Globe Capital LLC, et al., No. 18-cv-10421-NMG (D. Mass., Mar. 5, 2018).
[30]   BBC, The Development and Testing of New Drugs - Making Medicines, https://www.bbc.co.uk/bitesize/guides/zx3wgdm/revision/2.
[31] Press Release, Sinovac, Sinovac Announces Preliminary Results of Phase III Trial on sIPV (Apr. 19, 2018), http://www.sinovac.com/news/shownews.php?id=1081&lang=en.

seroconversion rates of the other two types of poliovirus are non-inferior to
the control vaccine.  And geometric mean titer ("GMT") of three poliovirus
types are all higher than the control vaccine.[32]

42.     The "seroconversion rate" is the rate at which polio antibodies develop in the body

and is the ultimate test of any polio vaccine.  Given its significance, publicly traded vaccine

companies regularly provide the actual seroconversion data in company disclosures concerning

Phase III clinical trials.

43.     Sinovac however, did not disclose any quantitative data concerning the critical

seroconversion rate in the April Disclosure, leaving Sinovac shareholders with no way to assess the

actual performance of Sinovac's sIPV and appreciate the magnitude of the breakthrough Sinovac

had achieved.

44.     Though the Company disclosed that the seroconversion rate of the sIPV was

"superior" to the control vaccine for polio type II and "non-inferior" to the control vaccines for

polio type I and type III (the "two other types of poliovirus"), with no quantitative data, the

disclosure was vague and incomplete.

45.     Phase III of the Company's sIPV clinical trials was conducted from August 2017 to

January 2018.[33]  Because the results of the Phase III trial were "unblinded" on or before April 19,

2018, it is indisputable that Sinovac knew about or otherwise had access to the data underlying the

"preliminary results."  Quantitative data—the actual seroconversion rate—must have constituted

the basis for Sinovac's disclosure; there is simply no other way that the Company could have

represented to Sinovac shareholders that the seroconversion rate of the sIPV was "superior" or

---

[32] *Id.*

[33] Press Release, Sinovac, *Sinovac Announces Positive Results From Phase III Trial Of a Sabin
Strain-Based Inactivated Polio Vaccine (sIPV) Published in the JID* (Apr. 16, 2019),
http://www.sinovac.com/news/shownews.php?id=1118&lang=en.

"non-inferior" to that of the control vaccines, without data-supported bases to compare the sIPV to the control vaccines.

46.     Instead of disclosing the seroconversion rates, Yin concealed the results in order to prevent the market from appreciating the magnitude of success the Company had just achieved through its sIPV.  Announcing the "preliminary results" with no actual data contributed only a modest 6% increase in the Company's stock price, which on April 19, 2018 traded at $7.88.

47.     By withholding the actual seroconversion rates underlying the disclosure of the results of Phase III of the sIPV trials, Yin and the Board kept Sinovac's stock valued at a price that would serve their goal: to take Sinovac private at a low price so that Yin and his friends could enjoy the profits of a new vaccine, entering a market that was widely known to be in desperate need of a new, low cost vaccine.

**E.     After Two Failed Take Private Attempts but Armed with Phase III Results, Yin Orchestrates the PIPE Transaction**

48.     On July 2, 2018, the date on which Sinovac terminated the Amalgamation Agreement, the Company announced the PIPE Transaction, wherein Sinovac would issue and sell to Vivo Capital and Advantech 11.8 million shares of Sinovac common stock at a purchase price of $7.35 per share in cash (the "PIPE Consideration").

49.     The price of $7.35 per share was patently unfair and dramatically undervalued Sinovac.  The market value of Sinovac stock during this time period is illustrative.  On July 2, 2018, Sinovac's stock traded at $7.43.  When the PIPE Transaction was announced on July 3, 2018, Sinovac's stock traded at $7.79.  Approximately a month before the PIPE Transaction, on June 8, 2018, Sinovac stock had reached a high of $8.66.  On their face, each of these values is in excess of the PIPE Consideration.  However, at the time, Sinovac's stock price did not reflect the operative reality of the Company because in the April Disclosure, Yin and the Board had withheld the

seroconversion rates from both Company shareholders and the market.  Neither shareholders nor

the market would learn of the seismic breakthrough in the global fight against polio until a year

later, in April 2019.

50.     Yin and the Board knew, though.   The Company brazenly touted in its

announcement of the Transaction that the $86.73 million in gross proceeds realized from the PIPE

Transaction would be used, among other things, to "*build additional production facilities to support

the development and commercialization of [the sIPV]*."[34]

51.     Sinovac also provided shareholders with no information concerning the sale process

or price negotiations concerning the PIPE Transaction.   Any such explanation would have

demonstrated that the sale process leading up to the PIPE Transaction was plainly not an arm's-

length process with an independent third party.  To the contrary, Vivo Capital and Advantech were

both members of the Amalgamation Group that had joined with Yin in attempting to take Sinovac

private at $7.00 per share in the 2017 Attempt.

52.     As a result of the PIPE Transaction, Yin, Vivo Capital and Advantech received

generous benefits in the transfer of economic value and voting power from Sinovac's shareholders

to them.   As the table below demonstrates, the PIPE Transaction awarded each of Yin's friendly

buyers 8.29% of the Company's voting power, correspondingly diluting public voting power in a

deal that drastically undervalued the Company.  Although Yin's individual voting power decreased,

the PIPE Transaction allowed Yin to amass a dominant position of approximately 40% of Sinovac's

voting power through the holdings of his allies Vivo Capital, Advantech, and SAIF Partners.   In

contrast to the gain to Yin and his friends, as a result of the PIPE Transaction, the voting power

held by all other Sinovac shareholders decreased from 71% to 59%.

---

[34] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (July 3, 2018) at Ex. 99.1.

| Shareholder | Pre- Transaction Voting Power | Post- Transaction Voting Power |
|---|---|---|
| Yin | 10.56% | 8.94% |
| SAIF Partners | 18.82% | 15.16% |
| Advantech | N/A | 8.29% |
| Vivo Capital | N/A | 8.29% |
| All other Shareholders | 71.11% | 59.31% |

**F.    After the PIPE Transaction, Sinovac Enjoys the Success of the sIPV's Phase III Trial**

53.    Finally, on April 16, 2019, well after the preliminary results of the Phase III trial became available to Yin and after the PIPE Transaction, Sinovac disclosed to the public what the insiders had known for over a year—the enormous success of the sIPV (the "Phase III Disclosure"):

> *This research implies that the studied sIPV is as effective as IPV in preventing poliovirus infection in infants aged 60-90 days, can be a reliable alternative to conventional IPV* and can be a good supplement to OPV in potentially preventing or minimizing VDPV emergence of VAPP. Participants in the sIPV arm of the trial developed neutralizing antibodies against poliovirus types 1, 2 and 3 *with seroconversion rates of 98% against type 1, 94.8% against type 2 and 98.9% against type 3*. Seroconversion rates were higher in the sIPV arm than in the IPV arm against all these types, significantly so against types 1 and 2. Participants in the IPV [] developed neutralizing antibodies against poliovirus types 1, 2 and 3 with seroconversion rates of 94.1% against type 1, 84.0% against type 2, and 97.7% against type 3.[35]

54.    The Phase III Disclosure illuminated that the seroconversion rate of Sinovac's polio vaccine was materially superior to the control vaccines for all three types of poliovirus. Sinovac's sIPV was as effective as the inactive polio vaccine widely used in the developed world. This was a huge success.

---

[35] Press Release, Sinovac, *Sinovac Announces Positive Results From Phase III Trial Of a Sabin Strain-Based Inactivated Polio Vaccine (sIPV) Published in the JID* (Apr. 16, 2019), http://www.sinovac.com/news/shownews.php?id=1118&lang=en (emphasis added).

55.     The successful development of Sinovac's sIPV in April 2019 meant that the Company could prepare for significant profits gained from the sales of the sIPV—particularly in light of the WHO's Initiative to eradicate polio through the introduction of IPVs.  Indeed, Sinovac now had an effective product to offer the multi-billion-dollar global market for polio vaccines, where demand was near certain.  Undoubtedly, this information—that Sinovac had successfully developed a sIPV that was cheaper to develop than an "attenuated" polio vaccine and was as effective as the IPV used in developed nations worldwide—was material to Sinovac's shareholders.

56.     By deliberately withholding for a year the seroconversion data disclosed in the Phase III Disclosure, Yin and the Board ensured that they could transfer value away from Company shareholders and funnel value to Yin, Advantech, SAIF Partners, and Vivo Capital.

### G.     Shareholders' Voting Rights and the Value of Their Investment Remain Diluted As Sinovac Achieves Record Success

57.     Since the PIPE Transaction, Sinovac's sIPV has reached new levels of success.  In January 2019, the product license application for the sIPV was accepted by China's NMPA.[36]  The NMPA is a Chinese government agency regulating drugs and medical devices.[37]  That Sinovac knew about or otherwise had access to the seroconversion rate data underlying the April Disclosure is evidenced by the NMPA approval.  Submitting the seroconversion rates, which is a critical test in polio-vaccine development, was surely necessary for NMPA approval.

58.     In March 2019, before Sinovac made the Phase III Disclosure, the NMPA granted the sIPV "fast track review" due to the "high demand for effective polio vaccines."[38]  After the

---

[36] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Apr. 30, 2020).
[37] National Medical Products Administration, http://english.nmpa.gov.cn/ (last visited Dec. 1, 2022).
[38] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Apr. 30, 2020).

Company made the Phase III Disclosure in April 2019, Sinovac disclosed that the "[product license application] is expected to be granted in the beginning of 2021."[39]

59.     On July 12, 2021, Sinovac received drug registration approval for its sIPV from the NMPA.[40]  Recently, on June 9, 2022, Sinovac received WHO prequalification for the sIPV.[41]  WHO prequalification is a massive success for Sinovac.  With prequalification, Sinovac's sIPV will be available for United Nations ("UN") agencies in both developed and lesser developed nations to purchase in support of eradicating polio.  While recognizing the seismic impact of Sinovac's sIPV on the global fight against polio, the success of the sIPV was also a massive win for Sinovac and Yin.  Once limited to lesser developed nations, WHO prequalification welcomed Sinovac to the markets of both developed and less developed nations.

60.     Separately, on April 13, 2020, Sinovac announced that it received approval from the NMPA to conduct Phase I/II human clinical trials of the Company's Covid-19 vaccine, CoronaVac, in China.[42]

61.     The Company's announcement prompted agreements between Sinovac and various entities.  First, on May 22, 2020 Sinovac disclosed that the Company had received $15 million from a joint investment made by Advantech and Vivo Capital.[43]  Then, on June 11, 2020, Sinovac announced that the Company and Instituto Butantan, the main producer of immunobiologicals in Brazil, had entered into a clinical development collaboration agreement to "advance the clinical trials of CoronaVac [] to Phase III."[44]  An agreement "for the supply, local production and

---

[39] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Dec. 7, 2020).
[40] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (July 20, 2021).
[41] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (June 8, 2022).
[42] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Apr. 14, 2020); Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Apr. 17, 2020).
[43] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (May 22, 2020).
[44] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (June 11, 2020).

technology licensing in respect of the CoronaVac," with PT Bio Farma, the leading vaccine manufacturer in Indonesia, came next on August 26, 2020.

62.    In 2020, Sinovac reported full year revenue of $510.6 million and gross profit of $443.4 million.  Sinovac explained that "[t]he increase was due to higher sales of the Company's influenza products, [] and the sales of CoronaVac."[45]  Sinovac recognized that "as we entered flu season for 2020-2021, demand for the flu vaccine was stronger than previous years due to the COVID-19 outbreak."[46]  Then, on June 2, 2021, the WHO authorized CoronaVac for emergency use in adults 18 years or older.[47]

63.    In 2021, with its worldwide sales of CoronaVac, Sinovac's results increased exponentially.  It reported $19.4 billion in revenue and $18.3 billion in gross profit.[48]  The Company cited "higher sales of CoronaVac and sales growth of the Company's other products[,]" (*i.e.*, the sIPV and the PPV under development) for its unparalleled success.

**H.    Yin and Sinovac Continue Their Campaign to Squeeze Out Company Shareholders**

64.    Sinovac Life Sciences Co., Ltd. ("Sinovac LS" f/k/a "Sinovac Research & Development Co., Ltd.") is a wholly owned subsidiary of Sinovac Biotech (Hong Kong) Limited, which is owned by Sinovac.  Sinovac LS is the developer of CoronaVac, and will be the "marketing authorization holder of CoronaVac [] with a vaccine [product] license from [NMPA]."[49]  Accordingly, the value of Sinovac's CoronaVac resides in Sinovac LS.

---

[45] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Apr. 23, 2021.
[46] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (Dec. 7, 2020) at Ex. 99.2.
[47] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (June 2, 2021).
[48] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (May 2, 2022).
[49] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (July 6, 2020).

65.     Since May 2020, a series of unusual transactions, all occurring during the Trading Suspension, suggests that Yin and his allies continue to siphon the value of the Company away from shareholders and towards insiders, and may signal an approaching take-private attempt.

66.     On May 22, 2020, Vivo Capital and Advantech, Yin's two buyers in the PIPE Transaction, invested $15 million in Sinovac LS.  Each of Vivo Capital and Advantech invested $7.5 million in the form of a convertible loan that, at their election, converts into 7.5% of the total equity interest of Sinovac LS.[50]  This transaction valued Sinovac LS at only approximately $100 million.

67.     On November 24, 2020, affiliates of CDH Investments, a Chinese private equity firm, and 1Globe entered into a share purchase agreement pursuant to which 1Globe will sell 6 million shares of Sinovac common stock to CDH for $15.00 per share.[51]  CDH Investments is an active investor in privatizations of Chinese companies listed on U.S. stock exchanges, but incorporated in the Cayman Islands.  The purchase price in connection with the share purchase agreement between CDH and 1Globe valued Sinovac at approximately $1.5 billion, a significant increase to the Company's currently frozen market capitalization of $460 million.

68.     On December 7, 2020, Sino Biopharmaceutical Limited ("Sino Biopharm"), a research and development conglomerate in China, invested $500 million in Sinovac LS in exchange for approximately 15% of the total equity interest in the company.  This transaction valued just Sinovac LS, as a subsidiary alone, at approximately $3.3 billion.

69.     The multi-billion dollar value of Sinovac LS, as a subsidiary alone, even before realizing additional revenues from ongoing sales of CoronaVac, implies a value of the whole

---

[50] Sinovac Biotech Ltd., Report of Foreign Issuer (Form 6-K) (May 22, 2020).
[51] Sinovac Biotech Ltd., Amended Statement of Beneficial Ownership (Schedule 13D/A) (Dec. 21, 2020).

Company well in excess of $3.3 billion.  Due to the Trading Suspension still in effect, however, Sinovac's stock price does not reflect the operative reality of the Company.

70.      The sIPV Phase III results concealed by Yin and the Board, as well as subsequent regulatory approvals and WHO preauthorization of the sIPV, would have a material impact on Sinovac's stock price if the stock were able to trade.  Likewise, Sinovac's explosive growth in revenue and profits fueled by sales of CoronaVac clearly have materially increased Sinovac's value, but neither this increase in Sinovac's value nor the developments related to Sinovac's other vaccines are realized in the Company's current frozen trading price of $6.47.

71.      Based on the approximate (and wholly out of date) valuation of Sinovac LS as of December 2020 ($3.3 billion), Sinovac LS alone is valued at 2x the value of the entire Company as of the last known transaction in Sinovac stock in November 2020 (valuing the entire company at $1.5 billion).  Using Sinovac's frozen market capitalization of $460 million, Sinovac LS is worth, at a minimum, 7x the frozen value of Sinovac.

72.      Sinovac LS is therefore an attractive investment for entities friendly with Yin and Sinovac.  Sinovac's shareholders, however, are once again losing value derived from a critical product, this time through the loss of value associated with CoronaVac and Sinovac LS, as Yin and Sinovac dole out ownership interests in Sinovac LS at the expense of public shareholders in the Sinovac parent.

73.      Additionally, in December 2020, after a meeting with Yin, 1Globe, the company defending itself in ongoing litigation against Sinovac, called upon Sinovac shareholders to "put aside their differences and work together to support Sinovac's COVID-19 vaccine, which is a front-

runner among global COVID-vaccine programs."[52]  This "truce" between 1Globe and Sinovac has conveniently not reached the courts, where litigation involving these parties is active, including in Massachusetts, Antigua, and Delaware.  The truce suggests that with the assurance that Sinovac stock will remain frozen until litigation in the aforementioned jurisdictions concludes; maintaining an active litigation posture is merely a ploy in Yin's campaign to transfer value away from Sinovac shareholders and towards Yin and his insiders.

## THE ACTION IS TIMELY

74.    Through application of the internal affairs doctrine, the substantive aspects of this Action are governed by the laws of Antigua and Barbuda. [53]

75.    Under Antigua law, a claim for wrongful equity dilution brought under Section 204 of the IBCA carries no limitations period and does not seek equitable relief.[54]

76.    Antigua law distinguishes between limitations periods that bar a remedy and those that extinguish a right.  Limitations periods that bar a remedy are considered procedural; those that extinguish a right are considered substantive.

77.    Defenses of delay and/or acquiescence extinguish a right.  Thus, an Antiguan court is more likely than not to determine that the defenses of delay and/or acquiescence concern a question of substantive law.

---

[52] *1Globe Capital, the Largest Shareholder of Sinovac Biotech, Reached Agreement with SEC and calls on all Stakeholders to Support*, Bloomberg (Dec. 23, 2020, 4:04 AM), https://www.bloomberg.com/press-releases/2020-12-23/1globe-capital-the-largest-shareholder-of-sinovac-biotech-reached-agreement-with-sec-and-calls-on-all-stakeholders-to-support.
[53] Section 204 of the IBCA references claims for restraining oppression, which is synonymous with claims for unfair prejudice.
[54] Plaintiff's counsel have retained an expert who specializes in Antiguan law in support of Plaintiff's allegations concerning the applicable limitations period.

78.     Accordingly, under choice of law principles in Massachusetts, Antigua law applies to the claim brought here and no limitations period applies to the Action.  Hence, the Action is timely.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings claims pursuant to Fed. R. Civ. P. Rules 23(a) and (b) individually and on behalf of all other holders of Sinovac common stock (except Defendants named herein and any person, firm, trust, corporation, or other entity related or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions as more fully described herein (the "Class").

80.     This action is properly maintainable as a class action.

81.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of members in the Class. According to Sinovac's annual report for 2022, as of April 29, 2022, there were 99,502,243 shares of Company common stock issued and outstanding.[55]

82.     Questions of law and fact are common to the Class and predominate over questions affecting any individual member of the Class.  The common questions include, *inter alia*, the following:

> a.     Whether Yin exercised control over the business decisions of Sinovac at all times relevant to the PIPE Transaction;

---

[55] Sinovac Biotech Ltd., Annual Report (Form 20-F) (Apr. 29, 2022).

b.      Whether as a result of the PIPE Transaction economic value and voting power was improperly transferred from Sinovac shareholders to Yin, Vivo Capital, and Advantech; and

c.      Whether Plaintiff and the other members of the Class are entitled to damages as a result of Defendants' wrongful conduct.

83.      Plaintiff will fairly and adequately protect the interests of the Class and has no interests contrary to it or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

84.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulties to be encountered in the management of this action that would preclude maintenance as a class action.

## COUNT I

### Direct Claim of Wrongful Equity Dilution
### (Against All Defendants)

85.      Plaintiff repeats and re-alleges each allegation set forth herein.

86.      At all relevant times, Yin exercised control over the business affairs of Sinovac.

87.      Acting under Yin's control, through the PIPE Transaction, Sinovac issued 11.8 million shares of Company common stock to Vivo Capital and Advantech at a price well below their actual value.  As a result of the PIPE Transaction, Yin, Vivo Capital, and Advantech increased their ownership interests and shareholder voting power, while Plaintiff's and the Class' ownership interests and shareholder voting power were decreased.

88.      The PIPE Transaction was an improper transfer of economic value and voting power from public shareholders to controlling shareholders.

89.     The PIPE Transaction constituted an act by the Company that effected an oppressive or unfairly prejudicial result and unfairly disregarded the interests of Sinovac's public shareholders.

90.     Yin used his power over the business affairs of the Company to consummate the PIPE Transaction, thereby exercising his power as a director of Sinovac in a manner that was oppressive or unfairly prejudicial and unfairly disregarded the interests of Sinovac's public shareholders.

91.     Plaintiff and the Class were damaged by the PIPE Transaction in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Awarding damages to Plaintiff for harm sustained as a result of the PIPE Transaction;

B.     Awarding Plaintiff the costs of this action, including attorneys' and experts' fees;

C.     Prejudgment interest; and

D.     Granting such other and further relief as this Court may deem just and proper.

Dated: December __, 2022                    Respectfully submitted,

                                            **BEATON AND PETERSEN PLLC**

                                            **By:    /s/ Stephen Ryan, Jr.**

**KESSLER TOPAZ MELTZER**                       Stephen Ryan, Jr. (BBO # 669727)
  **& CHECK, LLP**                              11 Maple Avenue
Eric L. Zagar *(pro hac pending)*               Shrewsbury, MA 01545
Geoffrey C. Jarvis *(pro hac pending)*          (508) 842-2540
Maria T. Starling *(pro hac pending)*           stephen@beatonpetersen.com
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706